UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DEREK SKUZENSKI

Civ No.:

Plaintiff,

-against-

**COMPLAINT**

THE CITY OF NEW YORK,
THE NEW YORK CITY DEPARTMENT OF
FINANCE, ANTHONY MIRANDA

**(JURY TRIAL DEMANDED)**

(Individually And In His Respective Capacity As
Sheriff of the Sheriff's Department, New York City
Department of Finance), WARREN GLOVER,
ELIJAH SEYFRIED, JOSE MARZAN, ARI
LIEBERMAN, JOSH HANTMAN,
And JULIO LOPEZ (Individually And In Their
Respective Capacities As Acting Officers of the
Sheriff's Department, New York City Department
Of Finance)

Defendants.
------------------------------------------------------------------X

The Plaintiff, DEREK SKUZENSKI, by and through his attorneys L & D LAW P.C.,

complaining of Defendants, jointly and severally, herein respectfully shows to this Court and

alleges the following:

<u>**NATURE OF THE CASE**</u>

1. This is an action to remedy the deprivation of Plaintiff's Constitutional rights and seeks

   relief for Defendants' violation, under color of state law, of his rights, privileges and

   immunities secured by the Civil Rights Act of 1891, 42 U.S.C. §1983, §1985, §1986, the

   First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the

   Constitution and laws of the State of New York.

2. Plaintiff further complains pursuant to the Human Right Law of the State and City of New

   York to remedy discrimination, retaliation, and unlawful termination directed at the

Plaintiff because of his age and race/national origin, and to seek damages to redress the injuries Plaintiff has suffered as a result of Defendants' unlawful behavior.

3.  Plaintiff also complaints of Defendants pursuant to New York Law §740 seeking damages to redress injuries Plaintiff has suffered as a result of being retaliated against by Defendants for engaging in protected whistleblower activities.

## JURISDICTION & VENUE

4.  Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and the Civil Rights Act of 1866 and 1871 which give this Court jurisdiction for each statute; the damages; exclusive of interest and costs in this instance exceed that of all lower courts, and this Court's pendent jurisdiction is also invoked.

5.  The unlawful employment practices alleged herein occurred wholly or in part, in the jurisdiction of the Eastern District of New York.

## JURY DEMAND

6.  Plaintiff hereby demands a trial by jury on all issues properly triable thereby.

## PARTIES

7.  Plaintiff Derek Skuzenki is an individual male who resides in the State of New York, Nassau County.

8.  Plaintiff Skuzenki served as the Undersheriff of the Sheriff's Department of the New York City Department of Finance.

9.  Defendant, the City of New York, is a municipal corporation, incorporated in the State of New York. Defendant the City of New York oversees all subsidiary agencies of the City of New York including the New York City Department of Finance, Sheriff's Department.

10. Defendant, New York City Department of Finance is a subsidiary municipal corporation operating under the purview of the City of New York, which oversees the New York City Sheriff's Department.

11. Defendant New York City Sheriff's Office, is the primary civil law enforcement agency of the City of New York, tasked with enforcing and executing legal processes/mandates issued by the State Courts, legal community and the general public, as well as other matters as required by the New York City Department of Finance and City of New York.

12. Defendant Anthony Miranda is the top commanding officer and actual Sheriff of the Sheriff's Department.

13. At all times material, Defendant Miranda was an individual male that resides in the State of New York.

14. Defendant Miranda held supervisory authority over the Plaintiff, controlling various tangible aspects of his employment, which included the power to hire and fire, direct the daily work activities of the Plaintiff, as well as take adverse actions against the Plaintiff.

15. At all times material, Defendant Glover was and is the Assistant Commissioner of the NYC Sherriff's Department.

16. Defendant Glover held supervisory authority over the Plaintiff, controlling various tangible aspects of his employment, which included the power to hire and fire, direct the daily work activities of the Plaintiff, as well as take adverse actions against the Plaintiff.

17. At all times material, Defendants Ari Lieberman and Josh Hantman served as "Advocates" for the Department of Finance/NYC Sheriff's Department.

18. At all times materials, Defendants Lieberman and Hantman were prosecutors for the municipal Defendants and held the power to bring charges against the Plaintiff and other similarly situated employees that could result in adverse employment actions.

19. At all times material Defendants Julio Lopez, Jose Marzan and Elijah Seyfried were employees of the Defendants and close confidants of Defendant Miranda.

20. At all times material, Defendant Miranda together with the other individual named Defendants acted in their official capacity, jointly and/or individually to engage in and conspire to violate Plaintiff's constitutional rights and other protected rights under applicable federal, state and city law.

21. During all times mentioned herein, the individual defendants, including Defendant Miranda, acted under the color of law, to wit, under color of the constitution, statutes, ordinances, laws, rules, regulations, policies, customs and usages of the State of New York and the City of New York.

22. At all times material, the herein named corporate/municipal Defendants served as joint employers of the Plaintiff, acting by and through each other as agents.

23. At all times material the City of New York acted through its agencies and affiliates to perpetrate unlawful acts against the Plaintiff for which Plaintiff is entitled to damages.

24. At all times material the tortious acts complained of herein arose in the boroughs of the City of New York and the County of Nassau.

## PRELIMINARY STATEMENT

25. The Plaintiff dedicated his life to serving the community. At an early age, Plaintiff volunteered at his local fire department and pursued his dream of helping others.

26. This dream was further recognized when Plaintiff earned multiple degrees, including a master's degree in criminal justice and a PhD in public policy and administration.

27. In 2013, Plaintiff put his degrees and skills to good use for the community by becoming a Deputy Sheriff in New York City. Plaintiff worked assiduously and continuously went above and beyond, earning him an exemplary record and helping him to rise quickly through the ranks.

28. By 2016 Plaintiff was promoted to Lieutenant, serving as the youngest commanding officer in the entire Department, and commanding officer of the Sheriff's Domestic Violence Unit. On account of Plaintiff's hard work and dedication, the Plaintiff was promoted in February of 2021 and became the Undersheriff/Chief of the Sheriff's Department.

29. In this role, Plaintiff served as an executive level police chief, responsible for overseeing the agency's operations, helping to write policy, and managing all sworn and civilian staff under his command. Indeed, Plaintiff exceeded all expectations and on his free time, Plaintiff volunteered to serve on the New York City Deputy Sheriff's Association of the Sheriff's Department (hereinafter referred to as "union" or "Sheriff's union"), eventually rising to the role of Vice President.

30. Throughout Plaintiff's tenure with the Sheriff's Department, the Plaintiff received numerous commendations and accolades. Notably, Plaintiff had a stellar record and never faced any disciplinary charges. However, all of this changed when Defendant Anthony Miranda was appointed as Sheriff.

31. From their very first interaction, Defendant Miranda showed discriminatory animus towards the Plaintiff. Defendant Miranda often remarked how Plaintiff was too young to

be in his position, and remarked how Plaintiff was too young to serve in an executive position on the union board.

32. When Plaintiff attempted to explain his experience, Defendant Miranda displayed a sense of ire towards the Plaintiff.

33. After this interaction, the factual allegations as set forth in greater detail below show that Defendant Miranda launched a discriminatory and retaliatory campaign against the Plaintiff.

34. However, Defendant Miranda's discriminatory animus was coupled with a loathing towards the Plaintiff for complaining about unconstitutional, unlawful and hazardous policies that were enacted by Defendant Miranda and Mayor Eric Adams.

35. In or around 2022, Mayor Adams and Defendant Miranda launched a major operation and enforcement effort dedicated to shutting down smoke and cannabis shops throughout the City of New York. However, this operation proved to not only be unlawful, it proved hazardous for deputy sheriffs and those tasked with handling and storing the cannabis.

36. As Undersheriff and as a union officer, Plaintiff raised concerns with Defendants Miranda over (i) the illegality of seizing property and the lack of authority to invade the cannabis shops and (ii) the imminent threat that the handling and storage of cannabis posted to deputy sheriffs.

37. When Plaintiff raised these complaints, Defendant Miranda engaged in a litany of retaliatory acts against the Plaintiff. Defendant Miranda targeted the Plaintiff with false charges and disciplinary proceedings. Defendants isolated the Plaintiff, restricted his access, withheld Plaintiff's pay, transferred Plaintiff to less desirable positions, refused to

approve leave for the Plaintiff, and most egregiously executed an unlawful search of the Plaintiff's home.

38. Even after Plaintiff's cessation from the Sheriff's Department, Defendant Miranda continued his discriminatory and retaliatory campaign by defaming and tortiously interfering with Plaintiff's job opportunities.

39. For Plaintiff, what was once a dream became a nightmare. As a result of Defendants' unlawful actions, Plaintiff now seeks redress for the damages he has suffered, simply for standing up for what is right.

## **FACTS**

40. In or around 2013, Defendants hired the Plaintiff as a Deputy Sheriff.

41. In or around 2016, Defendants promoted the Plaintiff to Lieutenant/Commanding Officer of the Domestic Violence Unit.

42. Plaintiff served in this role for in or around four years, until Defendants promoted the Plaintiff to Undersheriff, a role in which Plaintiff was the highest nonpolitical rank in the entire Sheriff's Department and in which Plaintiff was an executive level chief, responsible for overseeing much of the agency's units and detention centers/holding cells.

43. Plaintiff excelled in all of his roles and held an immaculate record with no write-ups or reprimands.

44. In or around 2022, Defendant City of New York by and through the authority of NYC Mayor Adams, appointed Defendant Miranda as NYC Sheriff (which falls under the purview of Defendant Dep't of Finance).

45. Upon information and belief, for some period before his appointment, Defendant Miranda was a retired police officer who previously ran for office for the New York City Council and for Queens Borough President.

46. As Sheriff, Defendant Miranda was Plaintiff's direct supervisor.

47. In or around May of 2022, the Plaintiff met Miranda in his official capacity for the first time.

48. Plaintiff sat down with Defendant Miranda so the two could go over official duties and responsibilities, however, Defendant Miranda focused the meeting on one thing; Plaintiff's age.

49. Without any provocation, Defendant Miranda berated and questioned the Plaintiff about his age, callously remarking "How is it that you even became a chief. **You're too young. You don't have that much time on the job."**

50. Plaintiff responded by telling Defendant Miranda that despite being young, he was dedicated and had almost "ten years" on the job and was even granted permanent civil service status.

51. Plaintiff observed that Defendant Miranda had a scornful look on his face as he replied to the Plaintiff, "So I guess I'm stuck with you."

52. The very next day, Defendant Miranda and the Sheriffs' Union Board held a meeting in Miranda's office

53. Much to Defendant Miranda's dismay and disgust, he met the Plaintiff again since Plaintiff served as the Vice President of the Union.

54. At this meeting, Defendant Miranda berated the Plaintiff, exclaiming "You can't be on the Union. **You are too young, and you should not be on this board!"**

55. In response, Plaintiff politely told Defendant Miranda that it wasn't right that he should be looked down upon because of his age, and that he had worked diligently for almost ten years to earn his position.

56. Defendant Miranda ignored Plaintiff's protestations and rather than cease with his unlawful and inappropriate behavior, Defendant Miranda set out on a retaliatory campaign against the Plaintiff.

57. On or about May 20, 2022, shortly after Defendant Miranda's appointment and his discriminatory remarks towards the Plaintiff, Miranda ordered the Plaintiff to have the Sheriff's Honor Guard attend an event.

58. Plaintiff was assigned to the Honor Guard back in 2014, and when Plaintiff became a lieutenant, he was placed in charge of the Honor Guard; responsible for coordinating events which included but was not limited to attending funerals, police memorials and events hosted by the City.

59. Despite being a member of the Honor Guard for almost nine years, Defendant Miranda told the Plaintiff he could not attend as a member of the guard.

60. Plaintiff was saddened to learn he could not attend the event in this capacity but rather just as an officer on detail.

61. However, when Plaintiff arrived at the event, he learned that it was a private dinner held by the National Latino Officers Association, for which Defendant Miranda was the founding President, and which was not sponsored by the City or any governmental agency. At the dinner, Defendant Miranda further told the Plaintiff that he should sit at the **"kids table."**

62. Plaintiff was shocked by the comment and surprised to learn that Defendant Miranda was ordering on duty members of the Honor Guard to attend an unofficial private event.

63. Plaintiff respectfully questioned why they attended the private event and why the Honor Guard was used in their official capacity for a Latino event, but not other private events for

other cultures; assuming of course that this was Defendant Miranda's new custom and practice.

64. In response, Defendant Miranda scowled at the Plaintiff, and told Plaintiff he was being removed as a member of the Honor Guard, and was being stripped of his duties as commander of this prestigious auxiliary assignment.

65. Defendant Miranda further told the Plaintiff that he would be replaced by Deputy Sheriff Abdel Abdallah, a rank-and-file deputy who was three ranks below the Plaintiff and also of Latino dissent.

66. Plaintiff was in disbelief that Defendant Miranda would usurp his duties and replace him with someone who was objectively less qualified.

67. The above actions by Defendant Miranda were taken against the Plaintiff were discriminatory and follow in temporal proximity to Defendant Miranda's comments about the Plaintiff's age, and Plaintiff's complaint to Miranda regarding how Plaintiff should not be looked down upon because of his age.

68. The above actions by Defendant Miranda were also retaliation against the Plaintiff who complained about the misuse of resources and for questioning why the Honor Guard was assigned to a private Latino Association event and were not assigned to other cultural events.

69. In the days and weeks that followed, Defendant Miranda began using his authority to set the Plaintiff up for failure.

70. On multiple occasions, Deputy Abdallah advised the Plaintiff that Defendant Miranda was stripping the Plaintiff of staff and reassigning them away from their regular duties so that they could attend Honor Guard events specifically for the Latino Officers Association.

71. As a result of the above, Plaintiff often found himself without the staff and resources necessary to complete pertinent work-related tasks.

72. The above actions taken personally by Defendant Miranda and/or through his agents constitute retaliatory acts that were severe and pervasive and rose well above petty, slight or trivial inconveniences.

73. In or around July of 2022, Defendant Miranda met the Plaintiff in person and told him that there would be a major change regarding Plaintiff's leave requests.

74. When Plaintiff inquired as to what the change would be, Defendant Miranda advised Plaintiff that his other direct supervisor, Joseph Fucito, (former Sheriff and now Chief of Operations) would no longer have any authority to approve Plaintiff's leave requests.

75. Instead, if Plaintiff wished to take any leave, he would have to put in this request for approval directly to Defendant Miranda and/or Undersheriff Julio Lopez.

76. Defendant Miranda's directive was perplexing to the Plaintiff, especially because Undersheriff Lopez was the same exact rank as the Plaintiff, yet he was now cloaked with the authority to approve Plaintiff's leave requests.

77. Upon information and belief, Defendant Miranda bestowed this authority upon Undersheriff Lopez because he was Latino.

78. The circumstantial evidence illustrates that Defendant Miranda subjected the Plaintiff and other similarly situated Caucasian, Asian and Black officers to disparate treatment, while favoring Latinos.

79. Defendant Miranda's directive to the Plaintiff served as an omen for the chain of events which followed.

80. On or about August 22, 2022, Defendant Miranda sent an email to the Plaintiff denying Plaintiff's remaining summer leave, despite that fact that it was already previously approved.

81. On or about September 8, 2022, Defendant Miranda again denied Plaintiff a leave request for late October and November which was previously submitted on August 8, 2022.

82. The above leave request was made months in advance with adequate staffing level and no alternative dates were offered to the Plaintiff.

83. As per Plaintiff's collective bargaining agreement (CBA), all leave requests must be answered within seven working days. However, Defendant Miranda retaliated against the Plaintiff by denying the request and making the Plaintiff wait almost five (5) weeks.

84. On or about September 9, 2022, the Plaintiff emailed Defendant Miranda and Undersheriff Lopez requesting alternative leave dates for 10/21, 10/24-10/26, 10/31-11/4, and 11/14-11/18.

85. As cited above, Defendants were supposed to answer the Plaintiff's request within seven working days. However, Defendants waited till on or about September 26, 2022, to answer the Plaintiff via email.

86. In Undersheriff Lopez' response, written on behalf of Defendant Miranda, the Plaintiff's leave request was denied in its entirety.

87. On or about October 6, 2022, the Plaintiff replied to the email, requesting alternative dates on account of the fact that Defendant Miranda had once again denied all prior requests. Plaintiff did not receive a response.

88. On or about October 18, 2022, after Defendant Miranda and Undersheriff Lopez continued to deliberately ignore the Plaintiff, the Plaintiff sent another follow-up email to request

alternative dates for leave. Once again, Defendant Miranda and Undersheriff Lopez ignored the Plaintiff.

89. On or about October 20, 2022, the Plaintiff spoke to Undersheriff Lopez in person, to address the ignored emails and to request alternative leave dates in December and January.

90. In response to Plaintiff's concerns and efforts to find new dates, Undersheriff Lopez advised the Plaintiff to follow-up in an email.

91. In accordance with Undersheriff Lopez' instructions, the Plaintiff sent yet another email on the same day, requesting alternative leave dates for December and January. However, Defendant Miranda and Undersheriff Lopez continued their streak of deliberately ignoring the Plaintiff.

92. On or about October 24, 2022, after numerous failed attempts, Plaintiff sent yet another email to request new leave dates in December and January. In conjunction with this request, the Plaintiff submitted a formal request in City Time.

93. On or about October 25, 2022, after keeping the Plaintiff in limbo for months, Defendant Miranda denied every single request

94. Defendant Miranda went even further by denying Plaintiff's earlier requests which were made six months prior, seeking a leave in March and April.

95. Even though the Plaintiff had properly accrued time, affording Plaintiff the ability to request leave, the Defendants denied every single request.

96. Tellingly, Defendant Miranda and all Defendants were fully aware that in accordance with City Rules and Regulations, if an officer did not utilize the leave days within a certain period of time, the time would then expire because in essence, the time coverts to sick leave and becomes restricted.

97. Defendants purposely ignored and were deliberately indifferent towards the Plaintiff's requests so that they could force Plaintiff to give up all his leave time on account of the expiration.

98. For the duration of time that Plaintiff was waiting for responses to leave requests, Plaintiff observed that Defendant Miranda was constantly authorizing leave for Latino officers, even though they had less time accrued than the Plaintiff.

99. The above denials of Plaintiff's requests were also taken shortly after Defendant Miranda's comments about Plaintiff's age, and Plaintiff's complaints regarding use of the Honor Guard for private Latino Association events.

100. As demonstrated above, Defendants discriminated and retaliated against the Plaintiff because of his age and protected complaints, while also subjecting the Plaintiff to disparate treatment on account of his race/national origin.

101. As a result of Defendants' unlawful conduct, the Plaintiff suffered from immense emotional distress because he was never able to make any plans outside of work. In addition, Plaintiff now faced the stress of never knowing if his plans would have to be involuntarily canceled.

102. The above events were compounded by additional retaliatory acts taken by the Defendants against Plaintiff. These acts are demonstrated as follows:

103. Defendant Miranda often remarked to the Plaintiff and others similarly situated that he believed work assignments should last for in or around five years.

104. However, after Defendants' denial of Plaintiff's leave requests, Defendant Miranda retaliated against the Plaintiff by transferring the Plaintiff four times in just over two years.

105.     From Plaintiff's own observations and experience, Latino officers were seldomly transferred and most remained in their positions for over ten years; or at most, incurred one or two transfers for the duration of their career.

106.     Each time Plaintiff was transferred, it caused great disruption to Plaintiff's command ability and authority.

107.     When Defendant Miranda took over as Sheriff, in direct temporal proximity to Plaintiff's protected complaints and Miranda's comments regarding Plaintiff's age, Defendant Miranda transferred the Plaintiff away from his Brooklyn Command into the Bronx.

108.     Notably, this transfer was less desirable as the command was often overwhelmed, overworked and short staffed.

109.     At this command, Defendant Miranda refused to provide the Plaintiff with additional resources which were necessary for the Plaintiff and his staff to work assiduously on behalf of the Sheriff's Department.

110.     In addition, Defendant Miranda was fully aware that the Plaintiff had built a stellar reputation in Brooklyn since Plaintiff had been stations there for over nine (9) years.

111.     Nevertheless, Defendant Miranda moved the Plaintiff to the Bronx for a total of nine (9) months and then involuntarily transferred the Plaintiff to the Defendants' Manhattan location.

112.     Despite the above retaliatory acts, the Plaintiff remained a dedicated officer of the Sheriff's Department and continued to serve as a dedicated executive board member of the union.

113.     In or around this same time period in October of 2022, Defendant Miranda began an unprecedented and unconstitutional campaign against marijuana shops in New York City.

114.     Defendant Miranda referred to this unconstitutional campaign as "regulatory inspections," but a rose by any other name would smell as sweet.

115.     Defendant Miranda initiated this campaign under the guise of "tobacco inspections." However, the evidence shows and Plaintiff observed that none of the businesses in question even sold tobacco.

116.     In the days and months that followed, Defendant Miranda by and through his deputy sheriffs began seizing large quantities of marijuana and other personal property from these cannabis shops which Defendant Miranda falsely classified as "paraphernalia."

117.     At or around this same time period in late Fall of 2022, Defendant Miranda began ordering the Plaintiff to initiate such seizures and participate in the campaign.

118.     In response to Defendant Miranda's orders, the Plaintiff spoke with Defendant Miranda in person and voiced great concerns over the legality of the initiative. In fact, these concerns were voiced by the Plaintiff at numerous executive staff meetings where Defendant Miranda explained his desire to expand the inspections and demanded that Plaintiff "tag along" on many of them.

119.     Specifically, the Plaintiff advised Defendant Miranda that the searches were illegal and likely violated the Fourth Amendment and Fourteenth Amendment of the United States Constitution, as the ostensible "regulatory (or tobacco) inspections" were actually unlawful searches and seizures that also violated the individual rights of those subject to them.

120.     Furthermore, the Plaintiff advised Defendant Miranda that it was unlawful and unethical to call the seizures "tobacco inspections" because none of the shops targeted or to be targeted sold tobacco. In addition, these inspections had to be compliant with the NYS Executive law which required the department to properly document any intention to use force and to report it. Yet, the inspections were being conducted by field support and tactical response teams that went in with SWAT gear and long guns which was not documented nor reported. Therefore, the NYC Department of Finance, Office of the Sheriff, had no legal authority under the US Constitution and under 837-T of the New York State Executive Law to conduct such a campaign.

121.     Plaintiff also made additional complaints to Defendant Miranda citing to the warrant requirement for such cannabis searches.

122.     Additionally, at a later point in time, the Plaintiff advised Defendant Miranda that (i) an overwhelming number of deputies and staff that served with the Plaintiff were experiencing significant health issues as a result of handling and storing seized marijuana and (ii) there was no safety training or precautions which taught deputy sheriffs and staff how to properly handle the marijuana and how to properly safeguard themselves.

123.     These concerns were raised to the Plaintiff both as a commanding Undersheriff/Chief and as Vice President of the Union.

124.     Finally, as cited above, the Plaintiff advised Defendant Miranda that the Sheriff's Office was not complying with New York State Executive Law which mandated that the Sheriff's Office complete Domestic Incident Reports and Use of Force Reports.

125.     Every time the Plaintiff raised these concerns with Defendant Miranda, Defendant Miranda ignored the Plaintiff and threatened disciplinary action against the Plaintiff for raising such concerns.

126.     Despite Defendant Miranda's dismissal of Plaintiff's protected complaints, the Plaintiff was compelled to abide by the law and his responsibilities to the Department as a sworn officer.[1]

127.     On or about November 10, 2022, a meeting was held between the Sheriff's union, the Department of Finance and the Defendants' Office of Labor Relations.

128.     Defendant Miranda was supposed to attend the November 10th meeting; however, he did not attend and ordered his top commanding First Deputy Sheriff, Maureen Kokeas to attend in his stead.

129.     At this meeting, the Plaintiff once again raised concerns about the legality of Defendant Miranda's search and seizure campaign, and further took the time to raise issues related to his denied vacation leave; an issue that Plaintiff raised prior, and which was taken in retaliation against the Plaintiff.

130.     Rather than address the Plaintiff's complaints which were echoed from other members on the union board, First Deputy Sheriff Kokeas berated the Plaintiff for questioning Defendant Miranda and personally attacked the Plaintiff for questioning vacation leave policies.

131.     Upon information and belief, First Deputy Sheriff Kokeas conferred with Defendant Miranda following this meeting and specifically spoke to Defendant Miranda about the Plaintiff's protected complaints and concerns.

---

[1] The New York State Constitution provides in relevant part that officers make take a sworn oath to obey and uphold the United States Constitution and the New York State Constitution.

132.     In temporal proximity to the Plaintiff's protected complaints under NY Labor Law, Defendant Miranda called the Plaintiff on or about November 16th, 2022, and advised the Plaintiff that he was prohibited from speaking with anyone at the Defendants' Legal Department and prohibited from raising any questions about the legality of Defendant Miranda's cannabis search and seizure campaign.

133.     Defendant Miranda further advised the Plaintiff that any and all requests for legal guidance would now have to be made through Defendant Lopez.

134.     The above hostile actions were carried out against the Plaintiff in retaliation for Plaintiff raising protected complaints.

135.     The above actions taken by Defendant Miranda against the Plaintiff severely hindered the Plaintiff's ability to properly carry out his job responsibilities and directly prevented the Plaintiff from complying with Chapter 4 of the Defendants' Patrol Guide.[2]

136.     All of the actions initiated by Defendant Miranda against the Plaintiff were not taken for any legitimate reason. Rather, they were meant to set the Plaintiff up to fail.

137.     This set up came to fruition many times, which placed the Plaintiff directly in harms way.

138.     For example, on or about November 23, 2022, at a local Bronx supermarket, the Plaintiff was tasked with enforcing a money judgment pursuant to property execution. This particular property execution was issued post-judgment by an attorney, which in turn raised

---

[2] Chapter 4 of the NYC Sheriff's Department Patrol Guide states in relevant part that one of Plaintiff's primarily duties and functions is to "Advise[s] staff on application of laws, rules, and procedures, including Civil Practice Law and Rules, Penal Law, Vehicle and Traffic Law, and other applicable laws of the State of New York and other jurisdictions. Furthermore, in the NYC Job specification (Code No.30315) Plaintiff's role/title was specifically tasked with consulting the Legal Department to "Review legal documents for legal sufficiency and filing fees and take appropriate action" together with conferring with "legal staff to analyze legal issues."

questions on whether the Plaintiff was properly performing the seizure of monies based on the judgment.

139. When Plaintiff arrived with his team to perform their assigned duties, the Plaintiff had questions regarding the legality of the seizure. Plaintiff attempted to get in touch with Defendant Lopez since Defendant Miranda restricted Plaintiff from contacting the Legal Department.

140. To wit, Defendant Lopez was not an attorney and instead of providing advice or reaching out to Legal for the Plaintiff, instead told the Plaintiff he had no idea how to proceed; leaving the Plaintiff in a dangerous situation which could have damaged the creditor and the debtor.

141. The means and mode by which Plaintiff and his officers executed collections could have dire consequences if it was not done with proper legal procedure. The Defendants essentially set the Plaintiff up for failure.

142. The following month, on or about December 29, 2022, Defendant Miranda issued a departmental memorandum regarding the seniority/hierarchy of employees and vacation selection for 2023.

143. In this memorandum, Defendant Miranda included a seniority list which illustrated patent discrimination and retaliation against the Plaintiff.

144. On the seniority list, Defendant Miranda demoted the Plaintiff and listed other deputy sheriffs with less experience in Plaintiff's title as ranking higher than the Plaintiff.

145. In the months that followed, as a result of Defendant Miranda's actions, the Plaintiff was compelled to file a number of protected complaints both individually and through the union.

146.      In or around January of 2023, the Plaintiff filed a complaint with the New York City Public Employee Safety and Health Bureau (PESH) as a result of severe health concerns which affected the safety of all deputy sheriffs involved with the seizure of vast quantities of marijuana from Miranda's campaign.

147.      In fact, the amount of marijuana seized was so vast, that Defendant Miranda ordered deputy sheriffs to store the marijuana in unsafe conditions without any regard for the safety of his employees.[3]

148.      The health concerns raised by the Plaintiff were substantiated by independent laboratories tasked with testing the marijuana.

149.      In the report's findings, some of the most concerning were the discovery of E.Coli, Salmonella and lead. One or more of these contaminants could cause severe infections, cancer and even organ failure.

150.      As a result of ignoring Plaintiff's complaints and as a result of Defendants' failure to properly train and put in safety precautions for their employees, deputies and staff were left exposed to these severe health risks.

151.      In or around early February of 2023, in conjunction with the above complaint, as Vice President of the Union and as a concerned officer of the Sheriff's Department, Plaintiff personally filed a complaint with the New York City Law Department raising grave concerns over the constitutionality and illegality of the marijuana campaign.

152.      Rather than perform any investigation, as a result of the above complaints, the Defendants continued their discriminatory, retaliatory and hostile campaign against the Plaintiff.

---

[3] "Tobacco inspections" which commenced in November resulted in the seizure of more than 600 pounds of marijuana through January 30th, 2023.

153.     In or around March of 2023, the Plaintiff's union attorney, on behalf of the Plaintiff, sent an email to Defendant Department of Finance (parent agency of the Sheriff's Dep't) and to the New York City Office of Labor Relations regarding the bias of the Sheriff

154.     In close temporal proximity to the above protected complaint, on or about April 7, 2023, by way of letter, the New York City Department of Investigation ("DOI") mysteriously and ostensibly unsolicited, alerted Defendant Miranda about an old unsubstantiated investigation which occurred back in November 2020-January 2021, accusing the Plaintiff and similarly situated employees/union members of misconduct while seizing contraband/evidence during an enforcement operation.

155.     More specifically, the April 7, 2023, letter was a referral to Defendant Miranda of its old investigate findings, advising Defendant Miranda that he could take administrative action.

156.     Overwhelming evidence suggests that the 2021 investigation was baseless. It is undisputed that at the time of the 2021 investigation, then appointed Sheriff Joseph Fucito conferred with DOI and confirmed that since there was no evidence to charge the named deputy sheriffs for misconduct, there would be no further disciplinary action.

157.     Upon information and belief, back in 2021 the Queens County District Attorney was also apprised of the DOI investigation and they too concurred that there was no evidence to charge the named officers in question; one of which was the Plaintiff.

158.     As a result of the above, the DOI conferred with the Department of Finance Advocate and former Sheriff Fucito to confirm no charges would move forward.

159.     Even though the matter was considered fully closed, mysteriously it was being referred again to the new Sheriff, Defendant Miranda-immediately after Plaintiff's last protected complaint.

160.     Upon information and belief, Defendant Miranda and/or his agents and affiliates acting on his behalf, dug up the old investigation in an effort to unfairly discriminate and retaliate against the Plaintiff and other similarly situated officers who had also filed protected complaints against Defendant Miranda.

161.     On or about May 1, 2023, shortly after Defendant Miranda received this DOI referral, without any independent investigation or due process afforded to the Plaintiff, Defendant Miranda ordered the suspension of four union board members together with several deputy sheriffs.

162.     Plaintiff was one of the members suspended.

163.     Tellingly, most of the deputy sheriffs that were suspended made whistleblower complaints regarding the cannabis searches and/or made complaints about discriminatory disparate treatment.

164.     In order to suspend the Plaintiff, Defendant Miranda acted in a shocking, unlawful and unconstitutional manner.

165.     On or about May 2, 2023, at or around 9:00AM the Plaintiff attended a funeral for the mother of a deputy sheriff that was the Plaintiff's friend and colleague.

166.     Plaintiff figured that he would stop by the funeral prior to heading to work for the day. Accordingly, the Plaintiff drove to the funeral in an assigned Sheriff's take home car that Plaintiff was permitted to use.

167.     During the funeral service, Plaintiff received a barrage of phone calls from Assistant Commissioner/First Deputy Sheriff, Defendant Glover. Plaintiff further received numerous phone calls from Defendant Lopez.

168.     Upon information and belief, Defendant Glover and Defendant Lopez called the Plaintiff during the funeral well over fifteen times.

169.     Since these calls were coming in as the funeral mass, the Plaintiff was unable to pick up in the middle of the mass.

170.     Plaintiff was also not on duty at the time.

171.     As the funeral mass ended, attendees lined up near and around the casket as poll bearers led the casket outside towards the hearse.

172.     As Plaintiff exited the procession, Plaintiff noticed yet another call from Defendant Glover, which the Plaintiff picked up immediately.

173.     On the phone, Defendant Glover advised the Plaintiff that they had an emergency and needed the Plaintiff to meet them at the office as soon as possible.

174.     Plaintiff inquired about the emergency and stated he would meet them. Then, Plaintiff heard Defendant Glover both on the phone and in person, exclaiming "Come over here!"

175.     Defendant Glover then instructed the Plaintiff over the phone to go to the church parking lot.

176.     As Plaintiff walked towards the church parking lot, startled and confused by Defendant Glover's call, the Plaintiff observed numerous officers in tactical swat gear.[4]

---

[4] Plaintiff observed Defendants Sgt. Elijah Seyfried, Deputy Sheriff Jose Marzan (a close confidant of Defendant Miranda) and Assistant Commissioner Warren Glover.

177.    The swat team officers approached the Plaintiff together with Defendant Glover, as Defendant Glover began to frisk the Plaintiff.

178.    Defendants' actions shocked the Plaintiff. Plaintiff felt unsafe, fearful and was riddled with severe anxiety and stress.

179.    Immediately after frisking the Plaintiff, Defendant Glover told the Plaintiff "We gotta talk. We are going for a drive."

180.    Defendant Glover then ordered the Plaintiff to get into his own Sheriff's car, which was a 'take home' vehicle provided by the Sheriff's Department to the Plaintiff.

181.    Shaking and confused, the Plaintiff was compliant as armed SWAT team officers watched his every move.

182.    When Plaintiff asked Defendant Glover what the issue and emergency was, Defendant Glover simply glared at the Plaintiff and provided no answer.

183.    At this time, Defendant Glover took the Plaintiff's keys from his hands, ordered Plaintiff into the back seat of the car, and advised Plaintiff that Defendant Marzan would drive the car.

184.    Next, Defendant Glover entered the car, sitting in the front passenger seat, and Defendant Seyfried entered the back seat next to the Plaintiff.

185.    Defendants then locked the doors.

186.    Plaintiff again inquired as to what situation and emergency, to which there was no response.

187.    Defendant Marzan then turned on the lights and sirens of the vehicle and proceeded to drive at a high speed from the location of the funeral towards the Bronx.

188.     As Plaintiff sat in the car, fearful of what would happen, Defendant Glover then handed the Plaintiff a three-page notice, outlining disciplinary charges against the Plaintiff for misconduct centered around the baseless and unsubstantiated prior DOI investigation of 2021.

189.     The Plaintiff was scared and baffled as he read through the unfounded charges, which also ordered that the Plaintiff be suspended for thirty (30) days.

190.     Just as Plaintiff finished reading the baseless charges, Defendant Marzan sped up the car past well past the speed limit, swerving in and out of traffic with lights and sirens.

191.     Defendant Glover then asked the Plaintiff, "Where are your guns," "We want your ID and shield," and "Give us your work phones."

192.     Plaintiff advised that these items were located at the Bronx command, which of course Defendants already knew since they were headed in that direction anyway.

193.     After a dangerous drive, in which Defendant Marzan haphazardly sped to the Sheriff's Bronx Command, Defendants confiscated all of the Plaintiff's work property as cited above. In fact, as a result of taking the Plaintiff's ID card, Defendants embarrassed the Plaintiff in front of others by forcing the Plaintiff to wait as Defendants now had to swipe the Plaintiff into every access point of the command.

194.     When the Defendants were finished confiscating the Plaintiff's items at the command, they ordered the Plaintiff back into the car. Defendant Glover then said to the Plaintiff, "We need to take your guns at your home."

195.     There was no emergency, no probable cause, no level of suspicion and no lawful reason for this order. Yet, under the color of law and cloak of authority vested by the Sheriff's Department; the Defendants turned on the lights and sirens and began driving at

a high speed from the Bronx Command location all the way to Plaintiff's home in Nassau County, Long Island.

196.    During the ride, Defendant Glover asked about every firearm owned and possessed by the Plaintiff. Plaintiff was fully compliant with this inquiry and advised Defendants of service weapons and personal long arms.

197.    In response, Defendant Glover stated, "As per Sheriff Miranda's orders, we are taking all firearms, including civilian firearms."

198.    Fearing additional retaliation and surrounded by Defendant SWAT team officers, the Plaintiff complied with the request.

199.    Plaintiff advised the Defendants that they did not have consent to enter his home and respectfully advised Defendant Glover that he would safely retrieve and safely hand over all guns to Defendants.

200.    In response, Defendant Glover shirked at the Plaintiff who was simply invoking his constitutional rights, and angrily told the Plaintiff, "We are coming in. You have no choice!"

201.    Since Defendants gave the Plaintiff no choice and were acting as uniformed officers under the color of law, the Plaintiff was forced under duress to comply.

202.    Upon arrival at the Plaintiff's house, Defendants escorted Plaintiff into his home as Plaintiff's wife stood there watching the events unfold.

203.    Defendants began an unlawful search of the Plaintiff's home, following Plaintiff into every room including the basement and bedroom, peering over the Plaintiff's shoulder as though Plaintiff was a hardened criminal.

204.     When Plaintiff advised Defendant Glover that one of his firearms was located in his bedroom and that he would bring it out to them, Defendant Glover ignored the Plaintiff, followed the Plaintiff into his bedroom and peered over the Plaintiff's shoulder as Plaintiff safely retrieved the firearm. Throughout this time, Defendant Glover peered into the Plaintiff's drawers and looked around at all of the Plaintiff's personal items.

205.     Finally, after more than two hours, the debacle ended, and Defendants left the Plaintiff's home.

206.     The above unlawful incidents were taken in retaliation for Plaintiff's protected complaints regarding age, race/national origin, and notably; complaints about the legality of the cannabis campaign and severe health effects it had on deputies.

207.     The above incidents violated the Plaintiff's constitutional rights and those rights secured under 42 USC 1983, 85 and 86.

208.     Defendants' actions as described above and as set forth below caused the Plaintiff to suffer from extreme emotional distress.

209.     On the following day, May 3, 2023, the parent City agency of the Sheriff's Department, the Department of Finance (DOF), ordered a meeting at the Sheriff's headquarters.

210.     At that meeting, DOF Commissioner Preston Nilback order and declared that individuals suspended (including the Plaintiff) were guilty of serious crimes and that they would be terminated. Yet, Plaintiff was afforded no due process under the law.

211.     At the meeting held at the executive command center, Plaintiff further noticed that his headshot picture was taken down. It was custom and practice to have pictures of chiefs on the wall, and despite Plaintiff being advised that he would not have his status or title

removed; Plaintiff's headshot was taken down in retaliation for Plaintiff filing protected complaints.

212.     At or around this same time, the Plaintiff filed a complaint with the New York State Department of Labor's Public Employee Safety and Health Bureau (PESH), citing to all of the retaliatory acts that the Defendants committed as against the Plaintiff.

213.     On or about June 1, 2023, Defendants advised that Plaintiff that he and the other suspended individuals were not allowed to come back to work even after the suspension concluded.

214.     On or about June 2, 2023, the suspension period ended, but Plaintiff was ordered to stay home and not return to work.

215.     On or about June 3, 2023, Armando Chabran, Defendants' Chief Personnel Officer for Human Resources Management & Labor Relations, sent correspondence to the Plaintiff, informing him that he would be reassigned yet again to the Sheriff's Administration located at 375 Pearl Street, New York.

216.     In the correspondence, Defendants' CPO Chabran specifically wrote "There will be no change to [Plaintiff's] civil service title and salary."

217.     Contradictory to the above correspondence and assurance by the Defendants, the Plaintiff was ostracized, usurped of his duties and given severe limitations which prevented the Plaintiff from adequately performing his job.

218.     For example, when the Plaintiff arrived to work at the newly assigned Manhattan location, Defendants advised the Plaintiff that he would have limited access to the facility unlike the rest of the employees in the building.

219.    Defendants ordered the Plaintiff to check in every morning with the building's private security, be issued a guess pass and then be forced to use an emergency exit door just to obtain access to the facility.

220.    Additionally, Defendants denied the Plaintiff any access to overtime, denied Plaintiff access to his department email, and even stripped the Plaintiff of his ability to login to the computer system.

221.    In fact, when the Plaintiff needed to use the bathroom, he had to wait for others to let him in. This demonstrates the discriminatory and retaliatory animosity of Defendants' actions.

222.    On or about this same day, Defendant Department Advocate Lieberman and Defendant Deputy Advocate Hantman informed the Plaintiff that they were seeking termination of the Plaintiff and would not offer any ability to negotiate. Plaintiff was stunned, as Defendants' policy and practice always provided employees with the ability to negotiate their case and be fairly investigated prior to the department seeking termination.

223.    Even more perplexing was the fact that during Plaintiff's tenure, numerous officers had been arrested, suspended, and accused of more serious crimes. Yet, none of them received any discipline.[5]

224.    Notably, the overwhelming majority of officers who were previously arrested and involved in serious crimes without facing discipline were Latino.

---

[5] The Latino officers in question who were treated better than the Plaintiff on account of race/national origin are Louis Suriel, Marcanthony Matos, Kenneth Matos, Louis Rodriguez, Emmanuel Pinnero, and Joel Contreras. Each of the aforementioned officers had more charges against them and more severe charges but were all offered plea deals/dispositions. Tellingly, unlike the Plaintiff, none of these officers were ever referred to the Sheriff's Advocate Office for prosecution.

225.     The above action taken by the Defendants illustrates discrimination and disparate treatment against the Plaintiff on account of race and/or national origin.

226.     At or around this same time period, Defendants also advised the Plaintiff that the Defendants' Department Advocates, Ari Lieberman and Josh Hantman would be working on the same floor as the Plaintiff.

227.     When Plaintiff was told this, he was surprised and equally saddened, as it was Defendant Lieberman and Defendant Hantman who advised Plaintiff that he would be prosecuted to the maximum extent. In fact, Lieberman and Hantman were personally overseeing and prosecuting the case. Yet, as a result of Defendants' new orders, Plaintiff would be forced to share a break area, lunch area, and bathroom area with them, which made the Plaintiff uncomfortable.

228.     As a result of the above actions taken by the Defendants, Plaintiff made a complaint to Defendant Lopez in person about the hostile work environment, and further complained about the distance and difficulty of traveling to the new assignment.

229.     In response, Defendant Lopez agreed that a different location would be much better for the Plaintiff, but Defendant Miranda's orders made clear that the Plaintiff was to continue working at the Manhattan location irrespective of the hostile environment and undue burden.

230.     On or about this same day, Plaintiff filed a written request with the Defendants for a return of his personal property, which Defendants illegally seized the month prior. This was one of the many unanswered requests that the Plaintiff made prior to no avail.

231.     The following day, on or about June 7, 2023, the Plaintiff together with other similarly situated employees that were subject to a baseless suspension were ordered to sit in empty cubicles.

232.     On this day, wildfire smoke from the Canada made its way into New York City. As a result, the City issued a major air quality alert, which in turn led to Defendants' authorization to allow employees to leave work. However, since Plaintiff's access to any email or emergency alert was restricted, the Plaintiff together with his fellow whistleblowers were left at the office as every other employee had left the office.

233.     The Plaintiff and other whistleblowers were made to withstand the poor air quality conditions and to leave work in unbearable conditions.

234.     The above actions and more demonstrate the severity of the hostile work environment which continued through the month.

235.     On or about June 20, 2023, Plaintiff was using the restroom urinal. As Plaintiff was using the urinal, Defendant Hantman entered the restroom and chose to use the urinal directly located next to the Plaintiff.

236.     Defendant Hantman stared at the Plaintiff and began telling the Plaintiff random personal stories. These actions by Hantman made the Plaintiff very uncomfortable, especially as it was Hantman who advised the Plaintiff that he sought Plaintiff's termination based on Defendant Miranda's orders.

237.     On or about June 22, 2023, Defendants retaliated against the Plaintiff by ordering him to assist Defendants Facilities Division and ordering the Plaintiff to perform manual labor at the Department of Finance warehouse. This order was unheard of for an officer at the Plaintiff's level. During this time, Defendants ordered the Plaintiff to inventory and

stock hundreds of cubicle parts and table legs used for Defendants' offices. Defendants literally made the Plaintiff count table legs and cubicle parts. The order to perform manual labor occurred on multiple occasions throughout Plaintiff's time at the Manhattan location.

238.     Furthermore, upon information and belief, other employees who were assigned to the Facilities Division received training and safety equipment which was necessary given the hazardous conditions of the environment which included operational forklifts, heavy crates and other construction materials in the Plaintiff's vicinity.

239.     As a result of being assigned to the Facilities Division, Defendants did not permit the Plaintiff to get overtime and prevent the Plaintiff from taking any other type of training which could help advance the Plaintiff's career.

240.     Each and every day, Defendants forced the Plaintiff to travel well over four hours in order to get to and from work.

241.     On multiple occasions, the Plaintiff and other whistleblowers/victims of discrimination assigned to modified duty at the Manhattan location were prohibited from attending Sheriff's events which included but were not limited to ceremonial events, firearms training, and community events.

242.     As time wore on and work conditions deteriorated, on or about September 5, 2023, Defendant Lieberman advised the Plaintiff's union lawyer, David Kirsch, that the Plaintiff had some time saved up and that it was a good time for the Plaintiff to consider leaving the job.

243.     The above action by Defendant Lieberman was an attempt to force Plaintiff from the job in what can only be described as a constructive termination.

244.     When the Plaintiff heard of this development, he was shocked, and his suspicions about being blackballed by Defendants was confirmed.

245.     This suspicion was further confirmed when the Plaintiff inquired with Defendant Hantman about a special ID card as well as a specialized department letter (colloquially referred to as a "good guy letter") that would permit the Plaintiff to carry a firearm in the event of Plaintiff's eventual retirement. The good guy letter also allowed Plaintiff to get future job opportunities and protect himself outside of work. It was law enforcement custom to give out such letters; that is until the Plaintiff asked for one.

246.     In response to this inquiry, Defendant Hantman advised the Plaintiff that this was a discretionary card, and that Defendant Miranda would not permit the Plaintiff to obtain one; even though qualifications for such an ID card were prescribed by federal law together with the Sheriff's Employee Handbook and not Defendant Miranda's discretion.

247.     Defendant Hantman gave the same story regarding the good guy letter and told Plaintiff it was in Defendant Miranda's discretion to issue such letters and therefore Plaintiff would not get one.

248.     Defendant Miranda's actions with regard to denying the Plaintiff a "good guy letter" constitute further discrimination and retaliation against the Plaintiff. This is evidenced by Defendant Miranda's issuance of a good guy letter to former Ex-Sgt. Jefferson "Bumpy" Rodriguez (Latino), who was terminated by the Defendants more than a decade ago after lying about being sick as he was moonlighting as a bouncer and later terminated for substantiated charges of committing fraud and perjury.

249.     Defendants' retaliatory campaign continued against the Plaintiff when on or about September 27 or 28, 2023, Plaintiff reached out to Defendant Glover to inquire about the return of his personal property.[6]

250.     In response, Defendant Glover reached out to the Plaintiff on his cell phone and advised the Plaintiff that there was no way for the Plaintiff to get his property back unless the Plaintiff put in a resignation.

251.     Plaintiff was appalled by this ultimatum and at this point Defendants' actions had left the Plaintiff in an environment that was so hostile and retaliatory that Plaintiff could no longer function in his role.

252.     As a result of all of the Defendants' discriminatory, retaliatory and unlawful actions, Defendants forced the Plaintiff to leave his role.

253.     On or about September 29, 2023, Defendants forced the Plaintiff to submit a 'resignation' which would be effective as of October 6, 2023.

254.     Subsequently, on this same day, Defendant Hantman sent an email to The Office of Administrative Trials and Hearings (OATH), stating in sum and substance that they would drop any and all charges against the Plaintiff.

255.     On or about October 1, 2023, in a state of desperation, Plaintiff filed another complaint of discrimination and retaliation against the Defendants with the New York State DOL, PESH.

---

[6] Plaintiff's personal property was located on Sheriff's property from which Defendants banned the Plaintiff. The property included personal items from Plaintiff's prior command as well as property unlawfully seized during the search and seizure at Plaintiff's home. The property included but was not limited to Plaintiff's personal firearms, clothing articles, diplomas, family photos, and kitchen appliances used at the office.

256.     The next day, on or about October 2, 2023, Plaintiff came to work and sat hopeless at his cubicle. At the time, the Plaintiff was assigned to a cubicle directly next to Defendants' Executive Director of Facilities, Sheila Williams.

257.     Plaintiff noticed that Director Williams was holding a Microsoft Teams meeting with Defendant Glover regarding Plaintiff's complaints and the overall violations reported to PESH.

258.     Rather than be sympathetic towards employees who became sick and developed severe medical conditions on account of the cannabis searches and storage; instead, Plaintiff noticed that Director Williams and Defendant Glover were trying to absolve themselves of liability and look for ways to circumvent necessary safety precautions.

259.     This above conversation made the Plaintiff very uncomfortable and left the Plaintiff in even more emotional distress.

260.     On or about October 3, 2023, the Plaintiff contacted Undersheriff, Chief John Schwartz, and inquired once again about retrieving his personal property.

261.     In response, Chief Schwartz advised the Plaintiff he would not get his property back, and then randomly decided to berate the Plaintiff over taking some of his sick leave.

262.     On or about October 4, 2023, Plaintiff's union attorney sent correspondence via email to Defendant Department of Finance's (DOF) Legal Bureau, once again requesting return of Plaintiff's property.

263.     More than a week later, an attorney from the DOF Legal Bureau advised Plaintiff's union attorney via email that the DOF had not authorized the illegal seizure of Plaintiff's property and therefore Plaintiff should contact Defendant Glover for its rightful return.

264.      Plaintiff made numerous attempts throughout this time period to contact Defendant Glover through multiple channels including Chief Schwartz, only to be advised that "as per the directive of the Sheriff" and by order of Defendant Glover, he would not get back his property.

265.      The above actions by Defendants only exacerbated the hostile work environment which forced the Plaintiff from his job.

266.      On or about October 4, 2023, the Plaintiff arrived for his last day of 'work.'

267.      On or about October 11, 2023, the NYS Department of Labor (PESH) interviewed the Plaintiff in connected with his protected complaints.[7]

268.      On or about this same day, after numerous attempts to retrieve personal Chief Schwartz advised the Plaintiff that he would be able to pick up all of his personal property, however, when the Plaintiff attempted to do so, Chief Schwartz ignored Plaintiff's request.

269.      Upon information and belief, these requests were ignored on account of orders from Defendant Miranda and/or his agents and affiliates in retaliation for Plaintiff's litany of protected complaints which preceded these events.

270.      On or about October 12, 2023, Chief Schwartz advised the Plaintiff that by order of the Sheriff, Defendant Miranda, he would not be allowed to return the Plaintiff's personal property under any circumstances.

271.      Chief Schwartz further advised the Plaintiff that he felt that Defendant Miranda's order was unreasonable but that it was beyond his control.

272.      The above retaliatory actions were carried out against the Plaintiff in retaliation for filing a protected whistleblower complaint.

---

[7] Presently, no action has been taken by the DOL/PESH. Plaintiff made numerous attempts to follow-up after an initial phone interview but has not received any response.

273.     The above retaliatory actions were also carried out in part against the Plaintiff for addressing age discrimination with Defendant Miranda.

274.     The above retaliatory actions were also carried out in part against the Plaintiff on account of discriminatory motives involving race/national origin since Latino/Hispanic officers who were charged and convicted with more serious offenses did not face the same disparate treatment as the Plaintiff.

275.     Even after Plaintiff's forced cessation from the Sheriff's Dep't, Defendant Miranda's discriminatory and retaliatory animus reverberated throughout the City and haunted the Plaintiff in the months that followed.

276.     For example, on or about October 23, 2023, the Plaintiff had an interview with NYC Health + Hospitals (Gouverneur Hospital) to become the Chief of Hospital Police.

277.     This interview was held virtually with the Hospitals' Chief Security Officer, Juan Checo, and Daniel Meisels, the Senior Associate Director for the Gouverneur Hospital location.

278.     The interview took place at noon, and since the Plaintiff was well qualified for the position Plaintiff felt that the interview went well.

279.     At the conclusion of the interview, Director Meisels advised the Plaintiff he would follow-up within a week because he anticipated that Plaintiff would make it to the next round of interviews.

280.     However, just as Director Meisels was relaying this information, Chief Security Officer Checo chimed in and curtly asked the Plaintiff "Do you know Anthony Miranda?"

281.     The Plaintiff was thrown off by the randomness of this question, but politely responded that he knew Defendant Miranda.

282.     At this point, Chief Security Officer Checo abruptly ended the interview. Subsequently, Plaintiff learned that despite Director Meisel's assurance of making it to the second round; he would be denied the opportunity and denied the job.

283.     Tellingly, the facts also show that Chief Security Officer Checo was a Latino/Hispanic former NYPD Detective who worked with and is friends with Defendant Miranda, as the two had served together at the NYPD during Defendant Miranda's tenure at that agency.

284.     Upon information and belief, Defendant Miranda communicated with Chief Security Officer Checo and used his influence in order to prohibit the Plaintiff from obtaining the Hospital Police position, even though that the Plaintiff was well qualified for the role.

285.     Even though Defendants forced the Plaintiff from his job, Plaintiff was still a dues paying member of the Sheriff's Union and acted as their Vice President.

286.     However, on or about December 27, 2023, Defendant Marzan (one of the deputy sheriffs who was previously involved in the unlawful capture of the Plaintiff and search and seizure at Plaintiff's home), sent an email to the Sheriff's union President, requesting that the Plaintiff be removed from the executive board.

287.     Upon information and belief, Defendant Marzan sent this email at the behest of Defendant Miranda and/or Defendant Glover who acted in coordination together to deprive the Plaintiff of his rights.

288.     In the months that followed, the Plaintiff's union proceeded with an administrative action against the City and Department of Finance, citing to improper practices by the City and the unlawful punishment of deputy sheriff officers including the Plaintiff.

289.    As part of this proceeding, Defendant Miranda testified under oath.

290.    While under oath, Defendant Miranda testified that when he received a referral from the DOI back on April 7, 2023, which named the Plaintiff in alleged (yet unsubstantiated) acts, he did not conduct any independent investigation and just accepted "the 'facts' that they provided."

291.    In addition, Defendant Miranda testified that back when the Plaintiff was suspended in May of 2023, he took the Plaintiff's guns and ID because he was concerned for Plaintiff's mental health and didn't want Plaintiff to harm himself or others.

292.    Yet, Miranda went on to testify that he nor anyone in his office ever offered mental health services to the Plaintiff and never advised Plaintiff that this was the rationale for taking the Plaintiff's property. Nor did Defendant Miranda ever request that Plaintiff undergo an evaluation.

293.    In accordance with the applicable rules and regulations of the City of New York, if Defendant Miranda actually thought that Plaintiff needed mental health treatment, there was an official process that needed to be followed. This illustrates how Defendant Miranda's legitimate non-discriminatory excuse for the actions taken against the Plaintiff were merely pretextual.

294.    As the explosive testimony continued, Defendant Miranda admitted in sum and substance that (i) the actions taken against the Plaintiff and others similarly situated did not come from DOI and rather came from Defendants Lieberman and/or Hantman; (ii) all tangible decisions were made directly by him; (iii) that he was aware of who on the Sheriff's union board was a whistleblower, and (v) that other officers were left in uniform

when charges were pending against them while the Plaintiff was forced to report to work in civilian clothes.

295. Rather than allow the Plaintiff to move on, Defendants continued their unlawful discriminatory and retaliatory campaign.

296. On or about April 12, 2024, the Plaintiff was interviewed by a panel to become the Director of Campus Safety for Medgar Evers College.

297. As the meeting ended, one of the interviewers, Professor Gregorio Mayers, began questioning the Plaintiff about Defendant Miranda. Then, Professor Mayers made it a strong point to tell Plaintiff that he and Defendant Miranda were good friends and therefore he would mention the Plaintiff to Defendant Miranda.

298. Though the interview went well, and the Plaintiff was more than qualified for the position, upon information and belief, once Professor Mayers reached out to Defendant Miranda, the Plaintiff was denied the position shortly thereafter.

299. The above actions constitute additional retaliation towards the Plaintiff for complaining of all the unlawful acts cited herein.

300. Throughout May and June of 2024, Defendants continued to retaliate against the Plaintiff and tortiously interfere with Plaintiff's ability to get a new job.

301. However, back at the Sheriff's Department, Defendant Miranda was awarding Plaintiff's perpetrators and ended up promoting Defendants Marzan, Lopez, and Seyfried as well as Chief Schwartz who was promoted to fill the Plaintiff's position.

302. The above actions cited throughout Plaintiff's complaint were taken against Plaintiff because of discriminatory animus against Plaintiff's age and race/national origin for which Plaintiff complained to Defendant Miranda.

303.     The above unlawful actions carried out against the Plaintiff were taken as a result of Plaintiff's protected complaints as a whistleblower.

304.     Defendants deprived the Plaintiff of due process and other constitutional rights.

305.     The above facts, which constitute a violation of law, were a direct and proximate legal cause of the Plaintiff's injuries.

306.     Defendants failed to properly supervise, train and discipline employees, agents, affiliates, servers and/or others under its control about discrimination and retaliation.

307.     The above are just some of the many examples in which Defendants explicitly and/or implicitly unlawfully harmed the Plaintiff.

308.     As a result of Defendants' actions, the Plaintiff suffered from severe depression, stress, anxiety and other formers of emotional distress.

309.     The above represents an ongoing violation

**AS A FIRST CAUSE OF ACTION FOR**
**VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1983**
**(Against All Defendants)**

310.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

311.     42 U.S.C. §1983 provides that:

> "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress."

312.     In committing the acts of discrimination and retaliation complained herein, the Defendants acted under color of law to deprive Plaintiff of his clearly established

constitutionally protected rights under the First, Fourth and Fourteenth Amendment of the United States Constitution.

313.     Plaintiff in this action is a citizen of the United States and all of the individual Plaintiff after she complained of unconstitutional violations and took steps to further harm Plaintiff's constitutional rights.

314.     Defendants also knew or should have known that they were unlawfully discriminating against Plaintiff, depriving Plaintiff of his right to freedom of speech, depriving Plaintiff of his right to be free of unreasonable searches and seizures, depriving the Plaintiff of his rights to substantive and procedural due process, and failed to respond or redress such actions in any way.

315.     Upon information and belief, Defendants were personally involved in either ordering or failing to take preventative and remedial measures to guard against the unconstitutional discrimination and retaliation against Plaintiff. Defendants also knew, or in the exercise of due diligence, should have known, that the unconstitutional actions taken against Plaintiff were discriminatory in nature and retaliatory.

316.     The failure of the individual supervisory Defendants to supervise and/or discipline any of the aforementioned Defendants with respect to their unlawful actions amounted to gross negligence, deliberate indifference, or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

317.     Defendants further failed to afford Plaintiff proper due process on account of multiple acts cited throughout the Complaint

**AS A SECOND CAUSE OF ACTION**
**(EQUAL PROTECTION – 42 U.S.C. §1983)**

318.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

319.     Defendants were at all relevant times, supervising employees, with oversight responsibility for the training, instruction, and supervision of their employees and of the Plaintiff.

320.     Defendants failed to intervene to prevent the clearly unlawful and unconstitutional actions taken against Plaintiff.

321.     Defendants actively participated in the clearly discriminatory, retaliatory and unconstitutional actions taken against Plaintiff.

322.     Defendants actively condoned other officers to participate in the clearly discriminatory and retaliatory actions taken against Plaintiff.

323.     Defendants also knew or should have known that their conduct was unlawfully discriminating against Plaintiff and failed to respond to or to address such actions in any way.

324.     Upon information and belief, Defendants were involved in either ordering or failing to take preventative and remedial measures to guard against the unconstitutional discrimination and retaliation against Plaintiff.

325.     Defendants knew, or in the exercise of due diligence, should have known, that unconstitutional actions taken against Plaintiff were likely to occur.

326.     The failure of the individual supervisory Defendants to supervise and/or discipline any of the aforementioned Defendants, officers, DOF prosecutors or other Defendants with respect to their unlawful discrimination and retaliatory actions amounted to gross negligence, deliberate indifference, or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

## AS A THIRD CAUSE OF ACTION
## (EQUAL PROTECTION – 42 U.S.C. §1983)

327.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

328.     The aforementioned acts Plaintiff was forced to endure at the hands of Defendants amounts to discrimination and deprives Plaintiff of equal protection under the law.

329.     The ensuing unlawful committed by Defendants were based on Plaintiff's age, national origin, race, and as Plaintiff's status as a whistle blower.

## AS A FOURTH CAUSE OF ACTION
## (*Monell* Claim – 42 U.S.C. §1983)

330.     Defendants violated the above statute through multiple acts of unlawful gender and race discrimination and retaliation.

331.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

332.     All of the acts and omissions by the Defendants described above were carried out against the Plaintiff pursuant to overlapping *de facto* policies and practices of the City of New York and its agents, which were in existence at the time of the conduct

alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of Defendant The City of New York and Defendant Department of Finance (Sheriff's Department).

333.    Defendant The City of New York and its agency, The Department of Finance, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual wrongful acts of Defendant Miranda and other Defendants and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

334.    The actions of Defendant Miranda and of other Defendants resulted from and were taken pursuant to the *de facto* policies and/or well-settled and widespread customs and practices of the DOF. The relevant policies, customs and practices of Defendants permitted Defendants to take unlawful and unconstitutional actions against the Plaintiff, as is described in great length and set forth above.

335.    The existence of the foregoing unlawful *de facto* unwritten policies and/or well-settled and widespread customs and practices is known to be encouraged, and/or condoned by supervisory and policy-making officers and the DOF.

336.    Notwithstanding knowledge of such an unlawful *de facto* unwritten policy, practice, and/or custom, these supervisory and policy-making officers and the DOF, have not taken steps to terminate this policy, practice, and/or custom, and do not properly train captains with regard to the unlawful acts cited throughout Plaintiff's Complaint, and instead sanction and ratify this policy, practice, and/or custom through their active encouragement of, deliberate indifference to, and/or reckless disregard of

the effect of said policies, practices, and/or customs upon the constitutional rights of Plaintiff and other persons similarly situated to Plaintiff.

337.     The aforementioned DOF policy, practice and/or custom of failing to supervise, train, instruct, and discipline supervisors and officers within the DOF is specifically exemplified and evidenced by the misconduct detailed herein.

338.     Plaintiff's injuries were a direct and proximate result of Defendants' wrongful *de facto* policy and/or well-settled and widespread custom and practice, and of the knowing and repeated failure of Defendants to properly surprise and train employees with regard to unconstitutional conduct.

339.     Defendant DOF knew or should have known that the acts alleged herein would deprive Plaintiff of her rights in violation of the United States Constitution.

340.     Defendants knew or should have known that the actions unlawful actions taken against Plaintiff would occur since almost identical actions of Defendants were complained of in the past and nothing was done to remedy such unlawful behavior.

341.     Defendants is directly liable and responsible for the acts of the individual Defendants because it repeatedly and knowingly failed to properly supervise, train, and instruct them to require compliance with the constitutions and laws of the State of New York and the United States.

342.     Defendants acted with deliberate indifference towards the Plaintiff as cited throughout the Complaint, which includes but is not limited to mishandling and/or failing to properly train employees who were tasked with assisting the Plaintiff and others similarly situated. The aforementioned constitute some of the many example by which Defendants deprived Plaintiff of his constitutional rights.

## AS A FIFTH CAUSE OF ACTION FOR
## VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1985
## (Against All Defendants)

343.     Plaintiff incorporates all preceding paragraphs of this Complaint as fully restated herein.

344.     Section 1985(3) provides, in relevant part, that:

> "If two or more persons in any State or Territory conspire… for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws… in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property… the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

345.     All of the aforementioned Defendants acted either, directly or indirectly, in concert with one another, in unlawfully discriminating and retaliating against Plaintiff on the basis of gender.

346.     Similarly, all of the aforementioned Defendants acted, either directly or indirectly, to cover up the unlawful discriminatory and retaliatory actions against Plaintiff.

## AS A SIXTH CAUSE OF ACTION FOR
## VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1986
## (Against All Defendants)

347.     Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

348.     Defendants failed to prevent a conspiracy amongst DOF employees to deprive Plaintiff of rights protected by the United States Constitution.

349.    Specifically, Defendants failed to prevent the execution of systematically discriminatory, retaliatory, hostile and unconstitutional actions against Plaintiff.

350.    As a result, Defendants violated the above statute.

### AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER STATE LAW (Not Against Individual Defendants)

351.    Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice:

> (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

352.    Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff as set forth herein.

353.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section §296.

### AS AN EIGHTH CAUSE OF ACTION FOR DISCRIMINATION UNDER STATE LAW (Not Against Individual Defendants)

354.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

355.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

356.     Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

**AS A NINTH CAUSE OF ACTION FOR**
**DISCRIMINATION UNDER STATE LAW**
**(As Against Individual Defendants)**

357.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

358.     New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

> "For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

359.     Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

**AS A TENTH CAUSE OF ACTION FOR**
**DISCRIMINATION UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**
**(Not Against Individual Defendants)**

360.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

361.     The Administrative Code of the City of New York §8-107 [1] provides that it shall be an unlawful discriminatory practice:

> "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge

from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

362.     Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff as set forth herein.

**AS AN ELEVENTH CAUSE OF ACTION FOR
DISCRIMINATION UNDER
THE NEW YORK CITY ADMINISTRATIVE CODE
(Not Against Individual Defendants)**

363.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

364.     The New York City Administrative Code Title 8, §8-107(1) provides that it shall be unlawful discriminatory practice:

> "For an employer… to discharge… or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter…"

365.     Each of Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

**AS A TWELFTH CAUSE OF ACTION FOR
DISCRIMINATION UNDER
THE NEW YORK CITY ADMINISTRATIVE CODE
(As Against Individual Defendants)**

366.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

367.     New York City Administrative Code Title §8-107(19) Interference with protected rights states that it shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

368.     Defendants violated the section cited herein as set forth.

**AS A THIRTEENTH CAUSE OF ACTION FOR
DISCRIMINATION UNDER
THE NEW YORK CITY ADMINISTRATIVE CODE
(As Against Individual Defendants)**

369.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

370.     The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

371.     Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful and retaliator conduct.

**AS A FOURTEENTH CAUSE OF ACTION FOR
DISCRIMINATION UNDER
THE NEW YORK CITY ADMINISTRATIVE CODE
(Not Against Individual Defendants)**

372.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

373.     New York City Administrative Code Title 8-107(13) Employer liability for discriminatory conducted by employee, agent or independent contractor states that:

a.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

b.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1.  The employee or agent exercised managerial or supervisor responsibility; or
2.  The employer knew of the employee's agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
3.  The employer should have been known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

374.     Defendants violated the section cited herein as set forth.

## AS A FIFTEENTH CAUSE OF ACTION FOR WHISTLER BLOWER UNDER THE NEW YORK STATE LABOR LAW 740 (Not Against Individual Defendants)

375.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

376. In relevant part, Section 740 of the NY State Labor Law as Amended, reads that employer(s) or his or her agents shall not take any retaliatory against an employee by doing any of the following:

> discharge, threaten, penalize, or in any other manner discriminate against any employee or former employee exercising his or her rights under this section, including (i) adverse employment actions or threats to take such adverse employment actions against an employee in the terms of conditions of employment including but not limited to discharge, suspension, or demotion; (ii) actions or threats to take such actions that would adversely impact a former employee's current or future employment;

377. Furthermore, an employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following:

> (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety;

> (b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such activity, policy or practice by such employer; or (c) objects to, or refuses to participate in any such activity, policy or practice.

3.Application. The protection against retaliatory action provided by paragraph (a) of subdivision two of this section pertaining to disclosure to a public body shall not apply to an employee who makes such disclosure to a public body unless the employee has made a good faith effort to notify his or her employer by bringing the activity, policy or practice to the attention of a supervisor of the employer and has afforded such employer a reasonable opportunity to correct such activity, policy or practice. Such employer notification shall not be required where:

> (a) there is an imminent and serious danger to the public health or safety;

> (b) the employee reasonably believes that reporting to the supervisor would result in a destruction of evidence or other concealment of the activity, policy or practice;

> (c) such activity, policy or practice could reasonably be expected to lead to endangering the welfare of a minor;

> (d) the employee reasonably believes that reporting to the supervisor would result in physical harm to the employee or any other person; or (e) the employee reasonably believes that the supervisor is already aware of the activity, policy or practice and will not correct such activity, policy or practice. 4. Violation; remedy. (a) An employee who has been the subject of a retaliatory action in violation of this section may institute a civil action in a court of competent jurisdiction for relief as set forth in subdivision five of this section within two years after the alleged retaliatory action was taken.

378.    Defendants violated the above provisions and Plaintiff is entitled to damages to remedy the unlawful acts perpetrated by the Defendants

## JURY DEMAND & RELIEF

Plaintiff Demands a trial by jury of all issues so triable pursuant to the Federal Rules of Civil Procedure.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all Defendants:

(a) a declaration that Defendants violated Plaintiff's federal and state civil rights;

(d) compensatory damages for the injuries suffered by Plaintiff by reason of Defendants' unlawful and unjustified conduct, in an amount just and reasonable and in conformity with the evidence at trial in an amount to be determined at trial;

(c) punitive damages against the individual Defendants assessed to deter such intentional and reckless deviations from well-settled constitutional standards to the extent allowable by law;

(d) damages for emotional distress, lost wages, back pay, front pay, statutory damages, medical expenses, interest;

(d) reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and all other applicable laws; and

(e) such other and further relief as appears just and proper.

Dated: New York, New York
      July 30, 2024

                    **L & D LAW P.C.**

                    _____/s/_____

                    Paul Liggieri, Esq.
                    11 Broadway, Suite 615
                    New York, NY 10004
                    (212) 374-9786
                    Paul@Ldlawpc.com
                    *Attorneys for Plaintiff*